

**U.S. Department of Justice**

*United States Attorney*

*Eastern District of Pennsylvania*

*Robert A. Zauzmer*
*Direct Dial: (215) 861-8568*
*Facsimile: (215) 861-8497*
*E-mail Address: bob.zauzmer@usdoj.gov*

*615 Chestnut Street*
*Suite 1250*
*Philadelphia, Pennsylvania 19106-4476*
*(215) 861-8200*

August 2, 2006

The Honorable Legrome D. Davis
United States District Judge
6614 United States Courthouse
601 Market Street
Philadelphia, PA  19106-1747

      Re:  United States v. Denis I. Shusterman
          Criminal No. 04-00364

Dear Judge Davis:

      Please find enclosed a courtesy copy of the Government's Sentencing Memorandum.  A copy has been served on counsel for the defendant, and the original has been filed electronically with the Clerk of Court.

      Respectfully yours,

      PATRICK L. MEEHAN
      United States Attorney


      ROBERT A. ZAUZMER
      Assistant United States Attorney

cc:  Ari R. Karpf, Esq.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

        v.          :          CRIMINAL NO. 04-00364

DENIS I. SHUSTERMAN          :

## GOVERNMENT'S SENTENCING MEMORANDUM

# TABLE OF CONTENTS

I.   Facts  . . . . . . . . . . . . . . . . . .  2

     A.   Shusterman's Commitment to Crime Even
          After Being Aware of the Authorities'
          Knowledge of His Conduct  . . . . . . . . . . .  3

     B.   The Coventry Market Episode Illustrates
          Shusterman's Character  . . . . . . . . . . . .  8

II.  The Applicable Procedure and Guideline Range  . . . .  15

     A.   The Significance of the Guideline Range  . . . .  18

     B.   The Guideline Calculation  . . . . . . . . . . .  24

     C.   There is No Ex Post Facto Issue.  . . . . . . .  29

III. Consideration of the Section 3553(a) Factors  . . . .  57

IV.  Financial Penalties  . . . . . . . . . . . . . . . .  61

V.   Conclusion . . . . . . . . . . . . . . . . . . . . .  63

Defendant Denis Shusterman stands convicted of 51 counts of wire fraud, bankruptcy fraud, perjury, bank fraud, and tax evasion.  During the period from September 1996 through March 2003, he stole over $10.8 million from his employer, Kimber Mfg., Inc., and evaded the payment of over $2 million in taxes on both legitimate and illegitimate income.  He also filed a fraudulent bankruptcy in order to escape a substantial part of a payroll tax debt claimed by the IRS, and presented false information to a federally insured bank in order to secure a $1.7 mortgage.

The Court is very familiar with this sordid tale of persistent greed and deception, having sat through more than two weeks of trial.  During that period, the Court heard the same avalanche of evidence which persuaded Shusterman to change his plea to guilty.  Thus, the government will not burden the Court with a repetition of the evidence, which is summarized at length in the government's trial memorandum and the presentence report.  Rather, we present this sentencing memorandum to discuss two salient points which were not addressed at the trial, and to address the Sentencing Guidelines calculation and proper sentence.

The government believes that Shusterman should receive a substantial term of imprisonment, within the range of 135 to 168 months. He engaged in wanton criminality for a period of years, persisting even after he was explicitly warned that the government was aware of and endeavoring to stop his illegal conduct. This brazenness comes as no surprise when his personal history of fraudulent conduct is considered. The substantial harm caused by Shusterman's conduct fully warrants a sentence within the recommended range.

I.   Facts.

The facts of this case are set forth at length in the government's trial memorandum and the presentence report. There are two additional matters, however, which the government wishes to bring to the Court's attention, which are vitally pertinent to sentencing. The first involves the fact that Shusterman persisted in his multi-million dollar thefts during a time that he knew he was under investigation; and the second relates to an earlier episode of fraud which starkly illuminates Shusterman's character.

A.   Shusterman's Commitment to Crime Even After Being
     Aware of the Authorities' Knowledge of His
     Conduct.

     At trial, the Court did not hear of the remarkable
fact that Shusterman continued to steal $4 million from
Kimber and Leslie Edelman even after Shusterman was
explicitly told by the government of its suspicions
regarding his conduct.  This information would have emerged
in detail during cross-examination of the defendant, and if
necessary, during the government's rebuttal case.  It
starkly demonstrates the quality of the intent and
seriousness of Shusterman's crimes.

     The facts are as follows.  On July 11, 2001, AUSA
Zauzmer, along with Agents Manning and Tengood of the IRS,
and Montgomery County Assistant District Attorney Laurel
Grass, met with Shusterman, who was represented at the
meeting by attorney John Rogers Carroll.  The government
requested this meeting.

     As of this time, the federal and county
authorities had been conducting a joint investigation for 16
months into the embezzlement which occurred at Temple Sinai.
The focus on Denis Shusterman's mother, Betty, and the
suspicions voiced by some Temple Sinai congregants regarding

Denis, had led the authorities to investigate his finances as well. What they had determined by this stage was that Denis Shusterman was not responsible for any misconduct at the synagogue, but that there were grossly suspicious matters in his own affairs.

The government, appreciating that there was clear evidence of wrongdoing by Shusterman but that a full accounting would require years of investigation, asked to meet with Shusterman to see whether he was willing to admit his conduct and resolve any criminal charges. At the meeting, AUSA Zauzmer stated that it would be in Shusterman's interest to admit any misconduct at an early stage, as he would receive consideration for such an admission in a plea. At the same time, AUSA Zauzmer stated, if Shusterman had an innocent explanation for his conduct, the government wanted to hear it; AUSA Zauzmer stated that the assigned agents had plenty of other matters to work on and had no interest in pursuing an innocent man.

Over the course of 90 minutes, Zauzmer described what the government had learned about Shusterman's affairs. As it turned out, this represented a fraction of the evidence which would ultimately be found, but nonetheless

revealed a good deal of criminal conduct.  Zauzmer explained
that the government was aware that millions of dollars had
been transferred from Kimber to Shusterman's accounts, and
that Shusterman had not paid income tax on much of it (and
indeed had not filed returns for many years).  The
government was further aware that Shusterman had filed for
bankruptcy in March 1999, and testified at a deposition in
February 2000, and made statements which were sharply
inconsistent with his apparent means.

        While the evidence of tax evasion and bankruptcy
fraud seemed clear, the major open question, Zauzmer
explained, was whether Shusterman was entitled to the
millions of dollars he was receiving from Kimber.  Without
access to Kimber's personnel and records, Zauzmer said, the
government had not yet been able to determine whether the
transfers represented compensation, a loan, or theft.  While
promising that the government would persist in its
investigation, Zauzmer invited Shusterman to help resolve
this issue, saying that the government would drop the issue
if Shusterman were entitled to the money, but that otherwise
it was in Shusterman's interests to own up to any
illegality.

Upon hearing all of this information, Shusterman made no statement.  Several months later, attorney Carroll contacted Zauzmer and stated that Shusterman had no interest in talking further to the government.  The government had no further direct contact with Shusterman.

What Shusterman did do was persist in his criminal conduct.  He soon moved to California (perhaps to put distance between himself and the Philadelphia-based investigators), engaging in the bank fraud for which he was convicted.  He returned to Kimber and persuaded Edelman not to cooperate with the government.  He told Edelman (and a number of others) that the government was solely pursuing a vendetta regarding Temple Sinai, and that Kimber should stay clear of it.  In fact, Zauzmer had explicitly told Shusterman and his attorney that the government had concluded by July 2001 that Shusterman was not responsible for any conduct at the synagogue, and that the government's investigation of Shusterman himself concerned only his relationship with Kimber and related matters.

Based on his lie to Edelman, Shusterman was able to continue in his employment, prevent Edelman's contact with the government (Edelman was advised by an attorney

located by Shusterman to assert his Fifth Amendment privilege), and continue to steal. Of the $10.8 million which Shusterman stole, approximately $4 million was taken after the July 11, 2001 meeting. It is difficult to imagine a clearer depiction of an individual's commitment to illegal conduct. Shusterman also persisted in his fraudulent conduct with respect to his tax obligations. He did not file his 1997 and 1998 M&D returns, nor his 1998 and 1999 personal returns, until early 2003, when he learned that the government planned to charge him with tax evasion for these years. At that time, he recruited an attorney to falsely tell the IRS that these returns had been filed earlier. He never filed a personal return for 2001 at all, and made many false statements in all of the returns he filed, both before and after the meeting with the government.

This narrative establishes beyond doubt that Shusterman was a man passionately committed to stealing from others, and nothing but a massive government investigation, which spanned more than four years, was going to bring him down. He never relented in his criminal conduct at Kimber until Kimber's owner finally wised up and fired him; Shusterman stole money on a grand scale until his very last

day of employment in March 2003.  Then, he never admitted
his wrongdoing until the very end of the trial, after the
government had presented the overwhelming evidence it had
marshaled, and was in the process in cross-examination of a
defense expert witness of demonstrating the frivolity of
Shusterman's defense to the tax charges.  And then, after
the jury was dismissed and the government's march toward a
jury conviction halted, Shusterman once again remarkably
proclaimed his innocence and asked for a new trial.

Such a brazen commitment to wanton illegality may
only be addressed with a sentence of incarceration to the
full extent suggested by law.

B.   The Coventry Market Episode Illustrates
     Shusterman's Character.

The other matter uniquely pertinent to sentencing,
which was not fully examined at trial, concerns the 1992-93
Coventry Market venture which produced the payroll tax debt
leading to Shusterman's bankruptcy fraud.  This episode as
well casts a bold light on Shusterman's character,
establishing (if there were any doubt after the evidence
regarding the later Kimber years) that he is a man committed

to deceiving and cheating others, and warrants incapacitation.

As the Court will recall, the evidence at trial established that the failure of the Coventry delicatessen venture created a large payroll tax debt. The IRS was of the view that Shusterman, as a partner in the enterprise, was a responsible party, and it obtained a lien against Shusterman of approximately $250,000 plus interest. In March 1999, to resolve this dispute, Shusterman filed for bankruptcy, ultimately settling with the IRS for approximately $127,000.

At trial, the government stated that it was not necessary for purposes of this case to resolve the dispute between Shusterman and the IRS. The government believed that such evidence was collateral and potentially prejudicial to Shusterman, as resolution of the dispute was not necessary to determine the criminal charges. In this case, the government stated that one may assume that there was a legitimate dispute between Shusterman and the IRS, but that it was unlawful for Shusterman to use the bankruptcy process, and make false statements during the bankruptcy, to

deceive the IRS regarding his means and thereby obtain a favorable settlement of the matter.

Nevertheless, during his brief direct testimony at trial, before he changed his plea, Shusterman undertook to attempt to put an innocent spin on his conduct at Coventry. In his telling, he and his family were the victims of mismanagement by their partners in the Coventry enterprise. This was something of a theme in Shusterman's history -- he embarks on a grandiose plan, it ends in failure and financial loss, and he blames someone else for misconduct.[1] In the Coventry instance, his claims are demonstrably false; what the episode really reveals is the long history of Shusterman's mendacity.

---

[1] There were many examples offered at trial. Shusterman tried to be a movie producer, but lost over $5 million; he and his partner blamed a disreputable distributor. Shusterman invested over $1.2 million in the Orion Financial enterprise, which ultimately closed; he blamed his long-time partner, Ronald Davis, for misfeasance. Shusterman gave $725,000 to Norman Myers, a custodial worker at a Norristown hospital, and wrote it off as a real estate investment; Shusterman's attorney suggested at trial this was some type of theft by Myers. The list goes on and on. All depict ambitious and sometimes flighty schemes which Shusterman was able to undertake because he was not spending his own money.

Shusterman entered the Coventry venture along with his parents, Jack and Betty, and Temple Sinai executive director Barry Wilf. (At the time, Betty Shusterman and Barry Wilf were already well underway in their huge thefts from Temple Sinai; the government established in the Wilf-Shusterman case that the two used money stolen from the synagogue to pay off debts related to the Coventry delicatessen.) As a group, they entered a complicated arrangement to take majority control of Coventry Market, a long-established Jewish market and caterer in Melrose Park, Pennsylvania. The agreement called for the continued participation and minority interest of the Rovner family, which had long operated the market.

With the Court's permission, Marsha Rovner will testify at the sentencing hearing. Before meeting the Shustermans, she and her husband, Daniel, were pillars of the local Jewish community, and had run their successful business for two decades. Incidentally, before the Shusterman years, they never wavered in faithfully paying payroll taxes as required for their employees. They had no difficulty in operating their business, but wanted to expand, and needed financing to do that. They met the

Shustermans, who offered to provide the necessary financing in exchange for a majority share in the business.

What ensued was a disaster. At trial, Denis Shusterman (during his direct testimony before he entered his plea) falsely testified that the Rovners maintained control of the finances of the business, and routinely failed to pay expenses of the business. He said that when he learned that payroll taxes were not being paid, he called a meeting with Marsha Rovner and demanded that this be corrected. The truth, unsurprisingly, is exactly the opposite.

In truth, it was Denis Shusterman who took over the financial affairs of Coventry, along with his accounting partner, Ronald Davis. The arrangement was that the Rovners would handle the food operations, based on their expertise, and Shusterman would attend to the finances, based on his expertise as a CPA. It was Shusterman who had the responsibility to and failed to pay the IRS the money which had been withheld from employees. While the Rovners had long used the respected ADP payroll service, and thus continually complied with their tax obligations, Shusterman insisted that he and Davis alone would handle the payroll.

Moreover, Shusterman paid himself over $20,000 in unwarranted payments, which the Rovners did not find out about until after the market closed and their attorney was able to wrest access to the books.

The Coventry venture failed because, in expanding to locations outside the Melrose Park market (including a restaurant in Chalfont and a bakery facility in Pennsauken), the new enterprise undertook substantial new obligations, but at the same time, the Shusterman group never delivered the large financing it promised. Soon swimming in debt, the Rovners lost not only the expanded venture, but their original market as well. This devastating setback took a significant toll on their lives and health.

The Coventry episode is nothing but a retelling of the Kimber affair, writ small. In the Coventry matter, as would later occur with Leslie Edelman, the Rovners put their faith in Shusterman, to their enduring detriment. At the outset, in 1992, the Rovners were respected proprietors of a decades-old business serving the Jewish community of eastern Montgomery County; by the end of 1993, their market was out of business and they were engaged in litigation with their erstwhile benefactors, Denis Shusterman and his cohorts.

Shusterman's conduct in the Coventry matter is consistent with the course of his affairs at Kimber. It should be recalled that his thefts at Kimber began small, when he could not yet be certain of the extent to which he could embezzle. In his first full year of employment, 1997, he stole approximately $150,000, mostly through transfers to his personal credit cards. Then, in 1998, Shusterman saw the opportunity to fraudulently gain control of the Camden Ordnance company, and steal another couple hundred thousand dollars. In later years, he would discover (by virtue of his receipt of a $3 million bonus in 1999), that he could transfer far larger sums, and no one would notice. But his conduct in 1997 and 1998 confirmed what his actions at Coventry had shown four years earlier, that he would take whatever opportunity he had to steal from others, whether on a small scale or a large scale, and that he would then lie to others to cover his tracks.[2]

---

[2] Of course, the misconduct proven in this case is not just a single episode called "Kimber," but a seven-year course involving an endless series of lies on every pertinent issue, from false statements to Edelman and Edelman's attorneys regarding expenditures, wire transfers, the Heidenreich loan, and the Camden Ordnance episode; numerous false statements to the IRS in multiple tax returns and letters; false statements under oath in the bankruptcy

What all of this evidence confirms is that Denis
Shusterman is a person committed to fraudulent conduct,
whose only motivation is his own gain.  When he could steal
a lot, he stole a lot, and persisted in that conduct even
when he knew the government was on his tail; when he could
steal only a little, he stole only a little.  Proof of this
abiding character makes clear that Shusterman is fully
deserving of the substantial sentence of incarceration he
faces, both to punish Shusterman and to protect the public
from his misdeeds.

II.  <u>The Applicable Procedure and Guideline Range</u>.

        Pursuant to <u>United States v. Cooper</u>, 437 F.3d 324,
330 (3d Cir. 2006), this Court must calculate the advisory
guideline range, and then consider that range along with all
the pertinent considerations of sentencing outlined in 18
U.S.C. § 3553(a) in determining the final sentence.  "The
record must demonstrate the trial court gave meaningful
consideration to the § 3553(a) factors. . . . [A] rote

_____

filing and deposition; misstatements to Millennium Bank
regarding Shusterman's assets; lies to his business
associates and acquaintances, and on and on.

statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." Id. at 329.  See also United States v. Schweitzer, 2006 WL 1889986, at *8 (3d Cir. July 11, 2006) (directing district courts to explain all guideline determinations and final sentences, stating, "There is simply no substitute for on-the-record discussion and deliberation.  It ensures that the parties are fully informed of their rights and obligations and that the appellate court will be able to assess the merits of the final judgment."); United States v. King, 2006 WL 1889976, at *8 (3d Cir. July 11, 2006) (district courts "should observe the requirement to state adequate reasons for a sentence on the record so that this court can engage in meaningful appellate review.").[3]

_____

[3]  In United States v. Grier, 449 F.3d 558, 574-75 (3d Cir. 2006), the panel held that the solitary statement, "The Court believes that 100 months is reasonable in view of the considerations of section 3553(a)," was insufficient to explain the district court's reasoning, and remanded for resentencing.  This opinion was subsequently vacated and rescheduled for hearing en banc, likely on a separate issue in the case not relevant here, regarding whether the preponderance standard applies at sentencing to proof of additional uncharged crimes.  The holding with respect to

In addressing the considerations of sentencing set
forth in 18 U.S.C. § 3553(a), the Court should begin by
determining the sentencing range established in the
Sentencing Guidelines.  The Third Circuit has confirmed:
"In consideration of the § 3553(a) factors, a trial court
must calculate the correct guidelines range applicable to a
defendant's particular circumstances."  Cooper, 437 F.3d at
330.  See also United States v. King, 2006 WL 1889976, at *8
(3d Cir. July 11, 2006) (explaining requirement of guideline
determination).  This Court must make findings pertinent to
the guideline calculation by applying the preponderance of
the evidence standard, in the same fashion as was employed
prior to the Booker decision.  Id.; see also United States
v. Giaquinto, 441 F.3d 195, 196 (3d Cir. 2006) (court may
continue to determine by a preponderance of the evidence and
consider the defendant's relevant conduct in determining the
guideline range).  In short, the guideline range should be
calculated in the same manner as it was prior to Booker.

> [W]e emphasize that the sentencing courts in this
> Circuit should continue to follow the requirement to

_____

the sufficiency of the sentencing explanation appears to
represent the view of the Third Circuit, as made clear in
the other cases cited above.

> "consider" the Guidelines by calculating a Guidelines
> sentence as they would have before <u>Booker</u>, including
> formally ruling on the motions of both parties and
> stating on the record whether they are granting a
> departure and how that departure affects the Guidelines
> calculation, and taking into account this Circuit's
> pre-<u>Booker</u> caselaw, which continues to have advisory
> force.

<u>United States v. King</u>, 2006 WL 1889976, at *8 (3d Cir.

July 11, 2006).

    A.   <u>The Significance of the Guideline Range</u>.

       The advisory guideline range carries considerable

weight even after <u>Booker</u>.  As the Third Circuit stated, "a

within-guidelines range sentence is more likely to be

reasonable than one that lies outside the advisory

guidelines range . . . ."  <u>Cooper</u>, 437 F.3d at 331.  The

Court later noted:  "The farther a sentence varies from the

advisory guidelines range, the more compelling the judge's

reasons must be."  <u>United States v. King</u>, 2006 WL 1889976,

at *7 (3d Cir. July 11, 2006), quoting <u>United States v.</u>

<u>Jordan</u>, 435 F.3d 693, 696-97 (7th Cir. 2006).

       The importance of the final guideline range has

nothing to do with the guidelines' former mandatory status,

which was eliminated in <u>Booker</u>.  Rather, the final guideline

range is the starting point for determining reasonableness

for three reasons: (1) only the guidelines comprehensively examine the full panoply of sentencing considerations; (2) the guidelines represent decades of nationwide experience and study; and (3) they are the only measure for avoiding unwarranted sentencing disparities. Congress explicitly created the Sentencing Commission and the guideline system to achieve these ends.

First, the guidelines are much more comprehensive than any other Section 3553(a) factor. Each of the other 3553(a) factors addresses only a single facet of the many issues posed by sentencing. "[T]he factors the sentencing commission was required to use in developing the Guidelines are a virtual mirror image of the factors sentencing courts are required to consider under Booker and § 3553(a)." United States v. Shelton, 400 F.3d 1325, 1332 n.9 (11th Cir. 2005); Statement of Judge Ricardo H. Hinojosa, Chair of the United States Sentencing Commission, quoted in United States v. Peach, 356 F. Supp. 2d 1018, 1020-22 (D.N.D. 2005). In formulating the guidelines, the Commission was required to and has considered all of the Section 3553(a) factors. See 28 U.S.C. §§ 991(b)(1), 994(b)(1), (c), (f), (g), (m); U.S.S.G. § 1A1.1 Editorial Note.

Second, the guidelines are the product of years of
nationwide experience and sustained study.  In drafting the
original guidelines (which became effective with respect to
offenses committed on or after November 1, 1987), the
Sentencing Commission canvassed prior sentencing practice,
identifying aggravating and mitigating factors.  28 U.S.C.
§ 994(m); U.S. Sentencing Commission, Supplementary Report
on the Initial Sentencing Guidelines and Policy Statements
16-17 (1987).  Since then, the Commission has continued to
study district court and appellate sentencing decisions, and
has fine-tuned the guidelines to take them into account.
U.S.S.G. App. C.  Indeed, the Booker Court specifically
affirmed that the Commission will continue to study
appellate and district court sentencing decisions, and "will
continue to modify its Guidelines in light of what it
learns, thereby encouraging what it finds to be better
sentencing practices."  Booker, 543 U.S. at 263 (Breyer,
J.).

        The Sentencing Commission's incomparable flow of
nationwide information, and its years of concentrated study
on this topic, merit strong consideration by judges who are
assigned the task of determining appropriate sentences for

criminal conduct.  United States v. Wilson, 350 F. Supp. 2d

910, 914-25, reaffirmed on denial of reconsideration, 355 F.

Supp. 2d 1269, 1271-88 (D. Utah 2005); United States v.

Wanning, 354 F. Supp. 2d 1056, 1060-62 (D. Neb. 2005);

Peach, 356 F. Supp. 2d at 1020-22.

Third, the correctly calculated guideline range is

the only means to evaluate the statutory sentencing goal on

which Booker placed so much emphasis: "the need to avoid

unwarranted sentence disparities," 18 U.S.C. § 3553(a)(6).[4]

Congress, the Court, and the guidelines all seek to minimize

such disparity compared to "all other similar sentences

imposed nationwide."  United States v. White, 406 F.3d 827,

_____

[4]  Every opinion in Booker acknowledged the express
national policy, as articulated by Congress, that sentences
be uniform across the country to the extent possible.  See,
e.g., Booker, 543 U.S. at 253 (majority opinion of Breyer,
J.) ("Congress' basic goal in passing the Sentencing Act was
to move the sentencing system in the direction of increased
uniformity."); id. at 744 (same) ("Congress' basic statutory
goal of diminishing sentencing disparity depends for its
success upon judicial efforts to determine, and to base
punishment upon, the real conduct that underlies the crime
of conviction."); id. at 292 (dissenting opinion of Stevens,
J.) ("The elimination of sentencing disparity, which
Congress determined was chiefly the result of a
discretionary sentencing regime, was unquestionably
Congress' principal aim."); id. at 303-04 (dissenting
opinion of Scalia, J.) ("the primary objective of the Act
was to reduce sentencing disparity.").

837 (7th Cir. 2005).  The Sentencing Guidelines provide the comprehensive information and guidance about sentencing around the nation that is essential to accomplishing Congress' goal of uniform federal sentencing.  "The only way of avoiding gross disparities in sentencing from judge-to-judge and district-to-district is for sentencing courts to apply some uniform measure in all cases.  The only standard currently available is the Sentencing Guidelines."  <u>Wilson</u>, 350 F. Supp. 2d at 924; <u>Wanning</u>, 354 F. Supp. 2d at 1061-62 ("we have no meaningful substitute for the neutrality, coherence, and equality" that the guidelines provide).  Thus, measuring reasonableness in relation to the guideline range serves "to minimize the wide disparity in sentencing across the country for similarly situated defendants that led to the enactment of the Guidelines in the first place."  <u>United States v. Paulus</u>, 331 F. Supp. 2d 727, 733 (E.D. Wis. 2005).

Thus, the Third Circuit in <u>Cooper</u> stated that "'[t]he Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country,' and provide a natural starting point for the determination of the appropriate level of punishment for criminal conduct."

<u>Cooper</u>, 437 F.3d at 331, quoting <u>United States v. Mykytiuk</u>, 415 F.3d 606, 608 (7th Cir. 2005).[5]

Accordingly, while many appellate courts have reversed as unreasonable sentences imposed outside the applicable guideline ranges,[6] reversals of sentences imposed within the guideline range have been extraordinarily rare, and have occurred only where the appellate court found that the district court did not adequately explain the sentence.

---

[5] In aiming for uniform sentencing, the appropriate focus is on sentences imposed in federal court for like offenses. A panel of the Third Circuit correctly found "no merit in [the] argument that the District Court should have considered what [the defendant]'s sentence would have been had he been convicted of a similar state-law offense. <u>Booker</u> directs our reasonableness review to the factors set forth under federal law for federal criminal offenses. That a separate sovereign chooses to implement its criminal sentencing scheme in a different manner does not impact our analysis under § 3553(a)(6), which focuses on the need to avoid unwarranted disparities among sentences issued by federal courts for violations of federal law." <u>United States v. Cropper</u>, 2006 WL 372338, at *4 n.7 (3d Cir. Feb. 17, 2006) (not precedential).

[6] <u>See, e..g</u>, <u>United States v. Zapete-Garcia</u>, 447 F.3d 57 (1st Cir. 2006); <u>United States v. Smith</u>, 445 F.3d 1 (1st Cir. 2006); <u>United States v. Davenport</u>, 445 F.3d 366 (4th Cir. 2006); <u>United States v. Hampton</u>, 441 F.3d 284 (4th Cir. 2006); <u>United States v. Moreland</u>, 437 F.3d 424, 434-37 (4th Cir. 2006); <u>United States v. Duhon</u>, 440 F.3d 711 (5th Cir. 2006); <u>United States v. Goody</u>, 442 F.3d 1132 (8th Cir. 2006); <u>United States v. Lazenby</u>, 439 F.3d 928, 933 (8th Cir. 2006); <u>United States v. McVay</u>, 447 F.3d 1348, 1357 (11th Cir. 2006).

See, e.g., <u>United States v. Carty</u>, 2006 WL 1975895, at *4-6 (9th Cir. July 17, 2006).  Moreover, the Courts of Appeals have emphasized that the further outside the range, either above or below, a sentence falls, the stronger must be the justification for such disparate sentencing.[7]

B.   <u>The Guideline Calculation</u>.

In this case, there appears to be no dispute with respect to the guideline range of 135-168 months calculated in the presentence report.  The defendant has stated no objections to the report.  The case conceivably raises an ex post facto issue, due to a change in the guidelines during the long duration of Shusterman's criminal conduct, but Shusterman does not dispute the government's view.  Nevertheless, for the benefit of the Court, we set forth our analysis below.

---

[7] "[T]he farther the judge's sentence departs from the guidelines sentence . . . the more compelling the justification based on factors in section 3553(a) that the judge must offer in order to enable the court of appeals to assess the reasonableness of the sentence imposed."  <u>United States v. Dean</u>, 414 F.3d 725, 729 (7th Cir. 2005).  The Third Circuit cited this view with approval in <u>King</u>.  <u>Accord United States v. Smith</u>, 445 F.3d 1, 4 (1st Cir. 2006); <u>United States v. Gatewood</u>, 438 F.3d 894, 896 (8th Cir. 2006); <u>United States v. Moreland</u>, 437 F.3d 424, 434 (4th Cir. 2006).

The guideline calculation set forth in the presentence report is accurate, and is as follows. Fraud offenses should group together, as all involve an aggregate loss. U.S.S.G. § 3D1.2(d). There are three types of fraud charged -- wire fraud on Kimber and Edelman, bankruptcy fraud, and bank fraud. The fraud on Kimber and Edelman caused a loss of $10,864,437.59. The bankruptcy fraud caused a loss to the IRS of $149,122.43. The bank fraud caused no loss. The total fraud loss was $11,013,560.02.

(The bankruptcy fraud statute, 18 U.S.C. § 157, is not listed in the Statutory Appendix of the guidelines which directs the choice of the applicable guideline. In this situation, the court is required to apply "the most analogous guideline." § 1B1.2. That is plainly the fraud guideline which now appears at Section 2B1.1. The gravamen of the charged Section 157 offense is that Shusterman conceived a scheme to defraud another entity (the IRS), and to execute that scheme made false statements in a bankruptcy proceeding. Thus, the charged offense is a standard fraud to which Section 2B1.1 applies. See, e.g., United States v. McBride, 362 F.3d 360, 373 (6th Cir. 2004) (§ 2B1.1 establishes the sentencing range for bankruptcy fraud).)

The guideline manual in effect at the time that Shusterman's crimes ended, on March 6, 2003 with respect to fraud offenses and on October 20, 2004 with respect to tax offenses, is that dated November 1, 2002, as amended on January 25, 2003. Under that manual, the offense level for a fraud loss of $11,013,560.02 is 26, increased by 2 because the crimes included misrepresentations made in a bankruptcy proceeding. § 2B1.1(b)(7)(B).

Shusterman is subject to a two-level increase, under Section 3B1.1(c), because he acted as the leader of criminal conduct. Specifically, Shusterman employed the assistance of his wife, Mindy Shusterman, in committing bank fraud, enlisting her to sign blatantly false documents misrepresenting her employment and income, in order to secure the Millennium Bank loan. More generally, Mindy Shusterman played a role in all of Denis Shusterman's misconduct, by furthering the fiction that she was the sole owner of M&D Consulting, Inc. The creation of this entity was essential to Shusterman's tax evasion, as explained at trial, and Mindy Shusterman abetted this effort, even though in truth, as every witness at trial testified, Mindy Shusterman had no role whatsoever in any of her husband's

business affairs, and Denis Shusterman treated the M&D
accounts as his own personal funds.

Finally, because Shusterman was clearly in a
position of trust as Edelman's chief financial officer, and
could not have committed the crimes except by abusing this
position of trust, the 2-level increase stated in Section
3B1.3 also applies.  This brings the total offense level for
the fraud offenses to 32.

The tax offenses do not group with the fraud
offenses.  United States v. Vitale, 159 F.3d 810, 813-15 (3d
Cir. 1998).  The tax loss, as stated in the presentence
report, is $2,087,279.34.  (The applicable provisions,
§§ 2T1.1 and 2T4.1, state that the court may use as an
estimate of tax loss the sum of 28% of the amount of
unreported income, unless a more accurate estimation may be
made.  Here, the government undertook to make a quite
precise calculation.)  Under the 2002 manual, the offense
level for this tax loss is 22, plus 2 for failing to report
more than $10,000 in criminal proceeds, § 2T1.1(b)(1), for a
total of 24.

Under the grouping rule, § 3D1.4, one level is
added to the higher level (for fraud), creating a total

offense level of 33.  At criminal history category I, that
produces an advisory sentencing range of 135-168 months.[8]

This sentencing calculation is conservative.  A
very good argument may be made that the fraud level should
be increased by 2 for perjury; the fact that he made false
representations in bankruptcy, which warrants a 2-level
increase under Section 2B1.1(b)(7)(B), does not fully
capture the independent harm of Shusterman's false testimony
at a deposition under oath, which normally produces an
additional 2-level enhancement.

It may also be argued that Shusterman's tax
offense level should be increased by 2 pursuant to Section

_____

[8]  Shusterman properly has not sought a reduction for
acceptance of responsibility, under Section 3E1.1.  He
entered a guilty plea only after compelling the government
to conduct an exhaustive investigation, and present an
exhaustive case.  Shusterman had numerous opportunities to
accept responsibility and relieve the government's burden,
beginning with a meeting which the United States Attorney's
Office requested on July 11, 2001 at which he was encouraged
to admit what the government then knew.  He did not do so,
and instead returned to Kimber, persuaded Edelman not to
talk to the government, and proceeded to steal another $4
million.  He entered a guilty plea only after the government
rested and had presented a case so overwhelming that anyone
within earshot of the courtroom knew exactly what the jury's
verdict would be.  Then, after the jury was discharged, he
again proclaimed his innocence and sought to withdraw his
plea.  In these circumstances, giving credit for acceptance
of responsibility is inconceivable.

2T1.1 for use of sophisticated means, given the fact that

his tax evasion involved use of a fictitious corporate

entity, and the extensive diversion of income through

payments to third-party creditors; and by another 2 levels,

under Section 3B1.3, for use of a special skill as a tax

accountant in crafting the fraudulent returns.

If all of these enhancements applied, the fraud

offense level would be 34, the tax offense level would be

28, and the grouped offense level would be 35, producing a

sentencing range of 168-210 months.  The government does not

seek these enhancements, however, viewing the calculation

stated earlier as sufficient and accurate.

C.   There is No Ex Post Facto Issue.

This guideline calculation is accurate despite the

fact that the fraud and tax guidelines were substantially

increased on November 1, 2001.  To be sure,

> [t]he ex post facto clause is violated when a court
> applies a change in the law which is adverse to the
> interests of a defendant where that change occurred
> after the commission of the crime.  See U.S. Const.,
> art. I, §§ 9, cl. 3.  Accordingly, when the court in a
> criminal case is confronted with post-offense
> amendments which call for a more severe sentence than
> that prescribed by the Guidelines in effect at the time
> of the offense, the court must apply the Guidelines as
> they existed at the time of the crime.

United States v. Brennan, 326 F.3d 176, 197 (3d Cir. 2003).
However, as the Third Circuit further held, the ex post
facto clause does not bar application of new penalty
provisions where the crime was a continuing offense, and the
criminal conduct continued after the effective date of the
amendment. Id. at 198. See also United States v. Moscony,
927 F.2d 742, 754 (3d Cir. 1991) (RICO offense which began
before and continued after enactment of guidelines was
continuing offense to which guidelines may constitutionally
apply); United States v. Audinot, 901 F.2d 1201, 1202-03 (3d
Cir. 1990) (same ruling with respect to escape charge);
United States v. Rosa, 891 F.2d 1063, 1068-69 (3d Cir. 1989)
(same ruling with respect to conspiracy charge). The theory
of these rulings is that a defendant who continues a
criminal scheme after the law has been amended acts with
full knowledge of the consequences of his conduct,
satisfying the concern of the ex post facto principle. This
rationale rejects any ex post facto challenge to application
of the 2002 guidelines in this case to the conduct which
contributes to the guideline calculation -- bankruptcy
fraud, tax fraud, and wire fraud.

Bankruptcy fraud.  In Brennan itself, the Third

Circuit specifically rejected an ex post facto claim with

regard to a bankruptcy fraud charge, on the grounds that it

is a continuing offense.  That ruling applies directly to

the bankruptcy fraud charge in this case which comprises

part of the fraud group.  That charge, Count 36, involved

Shusterman's false bankruptcy filing on March 16, 1999, and

perjury on February 9, 2000.  The loss of $149,122.43 caused

in the bankruptcy fraud scheme is part of the total fraud

loss, and Shusterman also merits a two-level increase to the

fraud guideline for making a false statement in connection

with a bankruptcy proceeding.

          The amount of loss caused in the bankruptcy fraud

is immaterial in the ultimate calculation, given that the

wire fraud loss was so much larger.  What is pertinent about

the bankruptcy fraud is that it causes a two-level increase

to the fraud level for making a false statement in a

bankruptcy proceeding.  To be sure, that enhancement

provision was not added to the guidelines until November 1,

2000,[9] and the Third Circuit has held that that amendment

_____

        [9]  The amendment applied to Section 2F1.1 of the
guidelines; the new provision was carried over into what now

                          - 31 -

cannot be applied retroactively to conduct which occurred prior to that date.  <u>Brennan</u>, 326 F.3d at 198.

However, in <u>Brennan</u>, the Court further held that bankruptcy fraud is a continuing offense, which ends not when it is discovered by federal prosecutors, but when the debtor reveals the fraud to the Bankruptcy Court or to the United States Trustee.  <u>Id.</u> at 199.  The <u>Brennan</u> Court therefore held that application of the November 1, 2000 amendment in that case was appropriate, even though prosecutors learned of and actually brought an indictment regarding the fraud before that date, given that the defendant never accounted to the Bankruptcy Court for the concealed assets.  <u>Id.</u> ("the concealment was ongoing as long as Brennan did not reveal the existence of his assets to the United States Trustee.  The date the prosecutors discovered the crime does not affect whether the crime was still being perpetrated.").

This ruling compels the conclusion in this case that Shusterman, who never informed his victim (the IRS), the United States Trustee, or the Bankruptcy Court of the

_____

appears as Section 2B1.1, when the two sections were combined effective November 1, 2001.

assets he misrepresented, committed an offense which
actually continued until his conviction in this case.
Application of the two-level enhancement to the fraud
guideline therefore does not violate the ex post facto
clause, pursuant to Brennan.

Further, even if the two-level increase presently
stated in Section 2B1.1(b)(7)(B) for making a
misrepresentation in a bankruptcy proceeding should not
apply, because it did not exist while Shusterman's
bankruptcy fraud was pending, Shusterman would still receive
a two-level increase because his bankruptcy crime involved
perjury in a deposition.  Under the guidelines in effect
both in February 2000 (i.e., the 1998 manual) and now, where
a defendant is convicted both of a fraud and of perjury in
relation to that fraud, the appropriate course is to add two
levels to the fraud offense level.  See 1998 manual at
§ 2J1.3 app. note 3; § 3C1.1 app. note 8; § 3D1.2 app.
note 5.  Thus, Shusterman would receive the same two-level
increase related to the bankruptcy case under either the

1998 or 2002 book, and there is no ex post facto violation for this reason as well.[10]

Tax fraud.  The tax fraud charged in this case was also a continuing offense, which encompassed the tax years from 1997 through 2003.  The indictment charged in Count 39 that there was a single course of tax evasion for these years, in which Shusterman employed a common set of stratagems to attempt to evade federal income taxes for all years.  The Third Circuit has upheld proof of the type of tax evasion scheme charged here, in which the government establishes that the defendant engaged "in a continuous scheme and course of conduct to conceal assets from the IRS" over a multi-year period.  United States v. Pollen, 978 F.2d 78, 82 (3d Cir. 1992).  Accordingly, pursuant to Brennan, the final guideline book within this period plainly applies to the total of the evasion.

Wire fraud.  The question of which book applies to the wire fraud on Kimber and Edelman presents the most

_____

[10]  As stated earlier, an argument can be made under the post-November 2000 manuals that Shusterman should receive two-level increases for both the bankruptcy misrepresentations and for perjury, but the government does not propose that here.

involved ex post facto question.  In contrast to bankruptcy fraud and tax evasion, the Third Circuit has held that mail or wire fraud is not a continuing offense, but rather is complete upon the execution of each mailing or wiring. United States v. Seligsohn, 981 F.2d 1418, 1425 (3d Cir. 1992).

The fraud guidelines were restated in Section 2B1.1, and increased significantly, effective November 1, 2001.  Shusterman's fraud on Kimber and Edelman straddled that date.  The formula which the government used to precisely calculate the theft was:

- -- Shusterman's receipts from Kimber,

- -- PLUS Shusterman's expenses paid by Kimber to third parties,

- -- MINUS Kimber/Edelman's expenses paid by Shusterman,

- -- MINUS Edelman and Ronald Cohen's salary and taxes paid by Shusterman,

- -- MINUS Shusterman's legitimate entitlement (i.e., $125,000 per year plus a one-time $3 million bonus).

This assessment resulted in a finding of a total theft of $10,864,437.59 during the entire period of Shusterman's employment by Kimber, from September 1996 to early March

2003.  When these calculations are divided into the period

before and after November 1, 2001, one finds that two-thirds

of the theft occurred before that date and one-third

occurred afterwards.  Specifically, the theft before

November 1, 2001 was $7,249,299.83, and the theft afterwards

was $3,615,137.76.

As for the tax loss, of the total tax loss of

$2,087,279.34, the sum which applies to the 2001-2003 tax

obligations (which became due after November 1, 2001) is

$874,997.41.

If a pre-2001 book applied exclusively to this

case, under the prior guideline applicable to fraud, Section

2F1.1, the offense level for a loss of more than $10 million

was 21, increased by 2 for more than minimal planning, by 2

for a misrepresentation in the course of a bankruptcy

proceeding (or perjury), by 2 for Shusterman's leadership

role, and by 2 for abuse of trust.  Under Section 2T4.1, the

base offense level for a tax loss of between $1.5 million

and $2.5 million was 20, increased by 2 for failure to

report criminal proceeds.  Grouping of these offense levels

(29 for fraud and 22 for tax) would produce a final offense

level of 30, and a range of 97-121 months.

The pre-2001 book should not apply, however, as Shusterman appears to acknowledge. Many courts have addressed the situation found here, in which part of an ongoing fraud occurred before and part occurred after a guideline change applicable to that fraud. With one exception, all have held that it is appropriate to apply the guideline manual in effect at the time that the fraud ended, on the theory that the defendant was fully on notice as he continued his conduct of the enhanced penalty. As will be seen below, even the one dissenting opinion would not preclude application of the later manual to the entire course of the fraudulent conduct, albeit by an unusual route.

The Sentencing Commission itself has weighed in on this issue, stating in Section 1B1.11(b)(3): "If the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses." In a background statement, the Commission explained:

> Because the defendant completed the second offense after the amendment to the guidelines took effect, the ex post facto clause does not prevent determining the

sentence for that count based on the amended
guidelines.  For example, if a defendant pleads guilty
to a single count of embezzlement that occurred after
the most recent edition of the Guidelines Manual became
effective, the guideline range applicable in sentencing
will encompass any relevant conduct (e.g., related
embezzlement offenses that may have occurred prior to
the effective date of the guideline amendments) for the
offense of conviction.  The same would be true for a
defendant convicted of two counts of embezzlement, one
committed before the amendments were enacted, and the
second after.  In this example, the ex post facto
clause would not bar application of the amended
guideline to the first conviction; a contrary
conclusion would mean that such defendant was subject
to a lower guideline range than if convicted only of
the second offense.  Decisions from several appellate
courts addressing the analogous situation of the
constitutionality of counting pre-guidelines criminal
activity as relevant conduct for a guidelines sentence
support this approach.

U.S.S.G. § 1B1.11 background.

In United States v. Vivit, 214 F.3d 908 (7th Cir.

2000), the Court of Appeals agreed.  In that fraud case, the

question involved the application of an amendment which

added a two-level enhancement for use of a minor.  While the

execution of the scheme at one point involved use of a

minor, the only post-amendment count did not involve use of

a minor.  The Court held that it was appropriate to apply

the amended guidelines, given that the calculation of the

fraud guideline involves a single offense level for an

entire course of conduct.  The Court stated that while mail

- 38 -

fraud may not be a continuing offense, it is grouped

together for sentencing purposes.

> [T]he relevant inquiry becomes whether the grouping
> rules give the defendant fair notice at the time a
> crime is consummated that the commission of further
> crimes subject to grouping would subject the defendant
> to sentencing under revised Guidelines.  The grouping
> rules, enacted in 1987, provide warning to criminals
> that completing another criminal offense similar to one
> committed previously places them in peril of sentencing
> under a revised version of the Guidelines.  The
> introductory commentary to the grouping rules explains
> that because the offense guideline for fraud, § 2F1.1,
> "deal[s] with repetitive or ongoing behavior," multiple
> fraud convictions are appropriately grouped when the
> convictions involve substantially the same harm.  <u>See</u>
> U.S.S.G. § 3D introductory commentary.  We believe that
> this conclusion reflects the intent of the Sentencing
> Commission to provide notice to criminals that engaging
> in ongoing fraudulent behavior involving the same type
> of harm risks grouping of convictions, which because of
> the one-book rule, will all be sentenced according to
> the Guidelines in effect when the latest conduct
> occurred.

<u>Id.</u> at 919.  The Seventh Circuit agreed with the statement

of the Eighth Circuit that "it was not the amendments to the

Sentencing Guidelines that disadvantaged [the defendant], it

was his election to continue his criminal activity."  <u>Id.</u>,

quoting <u>United States v. Cooper</u>, 35 F.3d 1248, 1250 (8th

Cir.), <u>vacated</u>, 514 U.S. 1094 (1995), <u>reinstated</u>, 63 F.3d

761 (8th Cir. 1995).

_Vivit_ thus stands for the proposition that where, pursuant to Section 3D1.2(d), an entire course of criminal conduct is aggregated in a single group for purposes of guideline sentencing, it is appropriate to apply the final applicable manual to the entire sum of the wrongdoing.  Many other courts have applied the same analysis and reached the same result.  _See, e.g._, _United States v. Sullivan_, 255 F.3d 1256, 1260-63 (10th Cir. 2001) (where the defendant was convicted of tax offenses in three counts covering three separate years, and a guideline amendment went into effect before the last year, the later guideline applied to the sum of the tax fraud, as that fraud is aggregated for guideline purposes);[11] _United States v. Lewis_, 235 F.3d 215, 217-18 (4th Cir. 2000) (same as _Sullivan_ -- later guidelines applied to multiple years of tax fraud which straddled amendment); _United States v. Kimler_, 167 F.3d 889, 893-95 (5th Cir. 1999) (mail fraud was committed before amendment, and counterfeiting offense was committed afterwards, but all were grouped into a single group based on the aggregate

_____

[11]  In an earlier opinion in this case, reported at 242 F.3d 1248, the court reached the opposite conclusion.  Then, on a motion for reconsideration, two of the three judges reversed their positions.

harm, and therefore there was no ex post facto violation in use of the later volume); United States v. Bailey, 123 F.3d 1381, 1404-05 (11th Cir. 1997) (continuing series of mail fraud and related offenses); Cooper, 35 F.3d at 1250-52 (Eighth Circuit holds that the amended guidelines apply to a series of firearms offenses which are grouped together into a single group); United States v. Regan, 989 F.2d 44, 48 (1st Cir. 1993) (multiple counts of embezzlement).

The only dissenter is the Ninth Circuit, in United States v. Ortland, 109 F.3d 539, 545-47 (9th Cir. 1997). There, the defendant was convicted of five counts of mail fraud, four of which involved conduct occurring before an amendment changed the way loss is calculated in a fraud case. The court held that application of Section 1B1.11(b)(3) to sentence the defendant on all five counts under the amended guideline violated the ex post facto clause. As a remedy, the court held that the district court must impose two sentences, applying the pre-amendment guidelines to the counts involving conduct occurring prior to the amendment, and the post-amendment guidelines to conduct occurring after the amendment. The court acknowledged that, as the Sentencing Commission stated in

its commentary, the sentence for the last count would also encompass the entire scheme, under the relevant conduct rule; "[t]he harm caused by the earlier offenses can be counted in sentencing the later one." Id. at 547 (emphasis in original).  The court suggested that the two sentences -- one for the pre-amendment offenses and the other for the last offense -- would "run concurrently to the extent that they overlap." Id.

Thus, under the Ninth Circuit's approach, the defendant, as in all other circuits, will receive a sentence for the later offense which encompasses all relevant loss and is calculated under the latest guideline manual.  Though the exercise it directs may therefore seem unnecessary, the court stated that it was warranted because otherwise "were the later count to fall at some time after sentencing, all that would remain would be the earlier sentences, which would be too long." Id.[12]

The Third Circuit addressed this issue in United States v. Bertoli, 40 F.3d 1384, 1401-07 (3d Cir. 1994).

---

[12] The court did not explain why, if the later count fell and the defendant had received only a single sentence, the defendant could not simply be resentenced, as often occurs when a conviction is partially overturned.

While some courts have facilely described <u>Bertoli</u> as
comporting with the Ninth Circuit's view regarding the ex
post facto issue, <u>see, e.g.</u>, <u>United States v. Sullivan</u>, 255
F.3d 1256, 1262 (10th Cir. 2001) (proceeding to disagree
with the Ninth Circuit view), that is only based on a
cursory reading of this complex decision.  A careful
examination reveals that <u>Bertoli</u> does not control the
situation presented here, and that the Third Circuit has not
taken sides against the vast weight of authority applicable
to a continuing fraud scheme.

        Bertoli and his co-conspirators were charged with
unlawfully manipulating the prices of certain stocks.
Bertoli was convicted of two counts -- conspiracy to
obstruct justice (Count Three), and obstruction of justice
(Count Six).  He was acquitted of the substantive fraud
charges.

        The conduct at issue in Count Six took place in
1990, when Bertoli and others transferred certain proceeds
of racketeering activity with the intent to hide their
criminal activity and unlawful gains from the United States
government.  The conspiracy at issue in Count Three occurred
from 1983 to 1992, and encompassed efforts to obstruct a

variety of government proceedings.  At sentencing, the court

divided the offenses into three groups:  "Group [One] would

consist of the three conspiracies to obstruct [F]ederal

court proceedings as well as Count [Six].  Group [Two] would

consist of the conspiracy to obstruct the [G]rand [J]ury

[I]nvestigation.  Group Three would consist of the

conspiracy to obstruct the SEC Investigation."  <u>Bertoli</u>, 40

F.3d at 1401.

        Because each group involved obstruction of

justice, the district court applied Section 2J1.2 to each.

That guideline, however, contains a cross-reference, calling

for application of the accessory-after-the-fact guideline if

the obstruction aimed to interfere with the investigation or

prosecution of a criminal offense, and use of the referenced

guideline would result in a higher offense level.  Applying

these provisions to each group, the court applied the fraud

guidelines to each group, and assessed an offense level of

25 for Group One, 22 for Group Two, and 22 for Group Three.

Upon applying the grouping rules, it found a total offense

level of 28.  <u>Id.</u> at 1401-02.

        The ex post facto challenge arose because there

was a critical amendment to the commentary regarding the

2J1.2 cross-reference, which came into effect after Count Six (the 1990 offense) was completed. Prior to the amendment, the cross-reference did not apply if the defendant aimed to obstruct an investigation of his own conduct, only someone else's. Without that amendment, the cross-reference would not apply to Bertoli's 1990 offense.

The Court of Appeals stated: "Apparently, the district court believed that if the conduct is grouped together, there is no need to assess the counts independently to determine whether ex post facto clause considerations arise. Thus, although finding that the conduct of Count Six occurred in 1990, the court nevertheless held that the crimes were completed in 1992, when the conspiracy's last overt act occurred." Id. at 1403. The Third Circuit disagreed:

> The fact that various counts of an indictment are grouped cannot override ex post facto concerns. Id. Therefore, the trial court erred by failing independently to analyze which Guidelines Manual should have applied to the conduct charged in Count Three. Our independent analysis of the question leads us to conclude that the 1989 guidelines apply to Bertoli's sentence.

Id. at 1404.

The Court then spent the remainder of its analysis on the question whether the amended commentary amounted to a substantive change in the law.  Finding that it did, the Court held that it could not apply to the conviction for Count Six, the subject of which predated the amendment.

The Court never addressed the matter at issue in this case -- whether a later book may apply to a continuing course of conduct which is assessed in the aggregate in the application of the pertinent guideline.  The grouping in <u>Bertoli</u> of Count Six with other offenses was not based on Section 3D1.2(d), which addresses offenses whose harm is considered in the aggregate (like fraud loss and drug quantity).[13]  The only pertinent sentence in <u>Bertoli</u> was

---

[13]  The opinion in <u>Bertoli</u> does not state the provision on which the grouping of Count Six with other acts of obstruction was premised.  Logically, it must have been § 3D1.2(b), which calls for grouping of "counts" which "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan."  In contrast, § 3D1.2(d), which applies in this case, groups offenses "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, of if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior."  (These provisions appeared in the 1992 manual initially applied in <u>Bertoli</u> and remain unchanged today.)

this:  "The fact that various counts of an indictment are grouped cannot override *ex post facto* concerns."  While that rule may apply to the situation in <u>Bertoli</u>, where discrete acts of obstruction were grouped for sentencing purposes, it is a different situation, as regarding fraud and tax offenses, where the guidelines direct in Section 3D1.2(d) that all harm caused in a continuing course of conduct be assessed in the aggregate.

The Court did not have the benefit of any of the competing case law, or the Sentencing Commission's views on this point.  Moreover, the Court noted that it was only called upon in <u>Bertoli</u> to determine the guideline applicable to Count Six, noting that "in this case the government does not argue that we should apply a Guideline Manual later than the 1989 Guidelines Manual to either Group 2 or Group 3 if we apply the 1989 Manual to Group one."  <u>Id.</u> at 1404 n.17. The Court repeated this observation in denying the government's motion for rehearing by the panel on this issue:  "In denying the motion the court observes that, as set forth in footnote 17, page 35 of the slip opinion, the government did not argue that we should apply a Guideline Manual later than the 1989 Guideline Manual to either Group

2 or Group 3 if we apply the 1989 Manual to Group one." <u>Id.</u>
at 1415.

In other words, the Court did not address the
relevance of the situation presented here, in which the
guideline calculation includes not only aggregated conduct,
but also grouped offenses (bankruptcy fraud and tax fraud,
and part of the wire fraud) which plainly continued after
the pertinent guideline amendment.

<u>Bertoli</u> may therefore be read to hold that, where
a discrete count of conviction concerns events which
occurred before a guideline change, the guideline manual in
effect at that time must apply to that count.  The Court did
not address the type of counts at issue here, which involved
ongoing fraudulent conduct which is totaled cumulatively for
offense level purposes.  The Court further did not address,
because the government did not present, the situation in
which other offenses occurred after the guideline amendment
to which the new guideline book should apply.[14]

_____

[14]  The Third Circuit's earlier decision in <u>Seligsohn</u>
likewise did not resolve the issue presented by this case.
In that case, which involved a variety of offenses, the
Court held that the district court would be required on
remand to determine when each offense was completed, in
order to determine the applicable manual consistent with ex

This case presents these issues, and as explained above, the great weight of authority holds that application of the manual in effect at the time the fraudulent course of conduct ended does not violate the ex post facto clause. In this instance, the correct rule was stated by, among many others, the Tenth Circuit:  the "'same course of conduct' is analogous to a continuing offense like conspiracy, the ending date of which determines the applicable sentencing guidelines."  <u>Sullivan</u>, 255 F.3d at 1263.  Because the defendant was clearly on notice at the time of the guideline change that this would occur, and continued his criminal conduct with that understanding, there is no violation of the constitutional principle.

As explained above, even the single Ninth Circuit decision which takes a divergent approach would not result in a different outcome.  The <u>Ortland</u> court faced the question which the government did not present in <u>Bertoli</u>, i.e., how to proceed where one manual is found to apply to

_____

post facto principles.  <u>Seligsohn</u>, 981 F.2d at 1424.  The Court did not, however, address any particular offense, stating that "[r]ather than make the detailed calculations at this juncture as to the appropriate total scores for each defendant, we prefer to leave the assessment to the district court in the first instance."  <u>Id.</u> at 1425.

earlier conduct and another applies to later conduct.

Ortland decided that the correct method is to calculate two guidelines sentences -- one for the pre-amendment conduct, and the other for the post-amendment conduct, and run them concurrently to the extent they overlap.  The court acknowledged that such an overlap is likely, in that in calculating a sentence for the later count under the later book, the court must take into account all relevant conduct, including that which occurred earlier.  In other words, the post-amendment guideline sentence will still encompass the entire course of relevant conduct; in this case, that leads to an advisory guideline range of 135-168 months.[15]

The result turns out the same because of the relevant conduct principle.  Pursuant to Section 1B1.3(a)(2), in the case of conduct such as fraud which is aggregated for sentencing purposes under Section 3D1.2(d), "relevant conduct" includes all of the defendant's acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction . . . ."  Such

_____

[15]  The Ortland court stated that it required a separate guideline sentence for the pre-amendment offenses only for the event that the later conviction might fall.  Ortland, 109 F.3d at 547.

relevant conduct may long predate the offense of conviction, and even the statute of limitations.  See <u>United States v. Stephens</u>, 198 F.3d 389 (3d Cir. 1999) (district court properly considered all related fraud as relevant conduct, even though the fraudulent acts continued for 21 years, beginning at a time long before the applicable statute of limitations).  This matter was not at issue in sentencing of the obstruction offenses in <u>Bertoli</u>, because, as explained above, the aggregate sentencing rules of Section 3D1.2(d) did not apply in that case.

Thus, in Shusterman's case, a guideline sentence for post-November 1, 2001 offenses alone must include the entire course of the related fraud on Kimber and Edelman, leading to the same guideline range calculated earlier. Such a calculation itself does not violate the ex post facto clause, as the Third Circuit and every other court have held.  A guideline that takes prior conduct into account in determining the sentence for conduct occurring within the guideline period does not violate the ex post facto clause. That is because the actual punishment is for the current offense only, and the defendant was on notice at the time he committed it that earlier conduct could figure into his

sentence.  <u>United States v. Bucaro</u>, 898 F.2d 368, 371 (3d

Cir. 1990), citing <u>McDonald v. Massachusetts</u>, 180 U.S. 311,

312 (1901) (which held that an increase in punishment for a

felony based on prior convictions does not violate the ex

post facto clause because the punishment is for the new

crime only).  <u>See also</u> <u>United States v. Pierce</u>, 17 F.3d 146,

150 (6th Cir. 1994) ("where a conviction is predicated upon

acts occurring after the Guidelines' effective date,

enhancing a base offense level based upon relevant conduct

that occurred before the Guidelines were enacted does not

violate the ex post facto clause.").

        In sum, there is no court that has ever held that,

in a situation like this, the sentencing court is compelled

to apply only the earlier book to the entire course of

criminal conduct.  "To hold otherwise could lead to the

anomalous result that a particular defendant could be

subject to a lower sentence if convicted of multiple

offenses spanning a revision of the Sentencing Guidelines,

than if convicted of the singular last offense after the

revision of the Sentencing Guidelines."  <u>Cooper</u>, 35 F.3d at

1252.

Holding Shusterman responsible under the more
serious guidelines which became effective on November 1,
2001, is particularly appropriate.  In situations where a
penalty is increased during the course of a continuing
crime, a defendant is often heard to complain that even
though he is held as a matter of law to have been aware of
the applicable law, he was actually unaware of the
development.  Shusterman's, however, is an unusual case in
which the defendant had explicit notice of both the
illegality of his conduct and the penalties he faced.

As explained above, government officials met with
Shusterman on July 11, 2001, and, in a 90-minute
presentation, outlined their knowledge as of that time
regarding Shusterman's bankruptcy fraud, tax evasion, and
unusual transfers to his own accounts from Kimber.
Shusterman's response to that meeting was to remain silent,
decline to address the government's concerns, and return to
Kimber to steal another $4 million during the ensuing 19
months.

At the same time, there was persistent and
prominent national coverage regarding a recent rash of
corporate fraud, including the debacle at Enron Corp. which

first emerged in the fall of 2001, and the occurrences at MCI and Adelphia which were exposed soon thereafter. During this period, there was extensive coverage of the determined efforts of federal legislators to adopt new laws and penalties to punish such conduct (including in part the guideline changes which took effect on November 1, 2001). Federal officials including the President of the United States publicly called for harsher treatment of corporate fraud, a fact which was known to any informed citizen. See, e.g., "Bush, on Wall Street, Offers Tough Stance," N.Y. Times, July 10, 2002, sect. A, page 1 (recounting administration proposals for increased penalties, and opposition by Senate Democrats, who proposed even stiffer penalties).[16] Shusterman thus knew both that his conduct was illegal and that legislation was afoot to increase the penalties for the very type of fraud in which he was engaged. Accordingly, it would be entirely inappropriate to spare Shusterman punishment under the provisions which directly applied to his criminal conduct at the time it

---

[16] Part of what resulted was the Sarbanes-Oxley Act, Pub. L. No. 107-204, which became effective on July 30, 2002.

occurred.  The revised guidelines directly apply in this case because Shusterman engaged in continuing crimes which persisted after the amendments.

The inequity of applying the pre-November 2001 manual in any manner is also evident when one examines the advisory range that would be produced.  As explained above, if only that manual were used, the advisory guideline range for the entire set of frauds would be 97-121 months.  Interestingly, that is similar to the range which would apply if one pretended that Shusterman's crimes before November 1, 2001 never took place.  In that scenario, there is no doubt that the post-November 2001 guidelines would apply to his conduct.

As stated earlier, the fraud which post-dated November 1, 2001 was approximately $3.6 million.  Using the new manual, the fraud offense level for a $3.6 million fraud is 24, plus 2 for abuse of trust.  The tax offense level for the $874,997.41 in tax loss which occurred after November 2001 is 20, plus 2 for failure to report criminal proceeds.  Grouping of these offense levels under Section 3D1.4 (26 for fraud and 22 for tax) leads to an offense level of 28, and a range of 78-97 months.

In other words, using the pre-November 2001 manual in this case not only is unwarranted based on consideration of the ex post facto clause, but would result in a striking windfall for Shusterman, who would largely escape punishment for more than $7 million in theft, for bank fraud, for bankruptcy fraud, and for over $1 million in tax evasion. Plainly, that result would be inconsistent with principles of justice.

The bottom line is that Shusterman committed continuing fraud and tax crimes, with full knowledge of his illegal conduct and of the penalties he faced. No court has ever held that only a pre-amendment manual may be applied to continuing conduct, and the clear weight of authority, unrebutted by the Third Circuit, is that there should be a single guideline sentence in this case based on the latest manual. The applicable manual calls for a sentence within the range of 135 to 168 months. There is no ex post facto infirmity in application of that range.[17]

---

[17] If the Court disagrees, the government submits that a sentence in the higher range is warranted under the authority granted in <u>Booker</u>. Any other result would give Shusterman a free pass for much of his criminal conduct, and would ignore the harsher penalties which should apply based on the law in effect when he continued his crimes.

III. <u>Consideration of the Section 3553(a) Factors</u>.

A full review of all pertinent factors suggests
that a sentence within the guideline range of 135-168 months
is appropriate.  Those factors are:

(1) the nature and circumstances of the offense and the
history and characteristics of the defendant;

(2) the need for the sentence imposed--

(A) to reflect the seriousness of the offense, to
promote respect for the law, and to provide just
punishment for the offense;

(B) to afford adequate deterrence to criminal
conduct;

(C) to protect the public from further crimes of
the defendant; and

(D) to provide the defendant with needed
educational or vocational training, medical care,
or other correctional treatment in the most
effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range
established for--

(A) the applicable category of offense committed
by the applicable category of defendant as set
forth in the guidelines . . . issued by the
Sentencing Commission . . . that . . . is in
effect on the date the defendant is sentenced;
. . .

(5) any pertinent policy statement . . . issued by the
Sentencing Commission . . . that . . . is in effect on
the date the defendant is sentenced.

>    (6) the need to avoid unwarranted sentence disparities
>    among defendants with similar records who have been
>    found guilty of similar conduct; and
>
>    (7) the need to provide restitution to any victims of
>    the offense.

18 U.S.C. § 3553(a).

     As explained earlier, the applicable guideline

range (the § 3553(a)(4) factor) deserves strong

consideration as the considered judgment of the expert

Sentencing Commission, and to avoid disparity with

defendants nationwide who have committed similar offenses

(§ 3553(a)(6)).  At the same time, Shusterman has not and

cannot set forth any persuasive basis for leniency.

     The offenses were quite serious (§ 3553(a)(1)),

involving the persistent looting of a significant

manufacturing company.  The central fraud continued for more

than six years, as Shusterman wrung every dollar he could

out of the company he served as chief financial officer.  At

the same time, Shusterman defrauded the IRS of over $2

million, a crime which harms every taxpayer and undercuts

our essential system of voluntary tax compliance (a fact

Shusterman, a tax accountant, well knew).  Further, the

crimes were particularly complex, and required a substantial government effort to terminate and prosecute.

While Shusterman has not previously been convicted of another offense (a fact accounted for in his criminal history category of I), that plainly results only from the fact that he was not caught during daily crimes which spanned a period of many years. Thus, as argued above, the history and characteristics of the defendant (§ 3553(a)(1)) support the substantial sentence of incarceration recommended by the guidelines. Shusterman committed the same crimes for years, in increasing severity as he had the opportunity. He is intelligent, well-educated, and capable of lucrative, honest pursuits, making his devotion to criminality all the more serious.

A significant sentence is also necessary to promote respect for the law, provide just punishment, and deter the defendant and others from committing similar crimes (§ 3553(a)(2)). Shusterman has failed to show any remorse whatsoever, and has never accepted responsibility for his conduct. He committed the crimes in a blatant fashion, continuing to steal even as he knew that he was under investigation. A sentence of imprisonment is

therefore necessary to punish his misconduct, and to stop future crimes he may commit if given the opportunity.  In addition, this case received significant public attention, because of the substantial amount of Shusterman's theft and his previous prominence in the local community, and a substantial sentence is warranted to deter others who will learn of this Court's action.

The other 3553(a) factors are not pertinent in this case, such as any need to provide the defendant with educational or vocational training, medical care, or other correctional treatment (§ 3553(a)(2)(D)).  While there is a need to provide restitution to the victims of the offense (§ 3553(a)(7)), the fact is that Shusterman has made no effort whatsoever to pay any restitution to his victims, and likely would not make significant headway in the upcoming years.  It is far more important to punish his offenses through incarceration, for all of the reasons set forth above.

This case, in short, involves persistent and serious criminality.  Any relevant consideration of sentencing supports the conclusion advocated by the

Sentencing Commission, that Shusterman should receive a substantial term of incarceration within the advisory range.


IV.  **Financial Penalties**.

At sentencing, this Court should enter the preliminary order of forfeiture as part of the judgment, pursuant to Federal Rule of Criminal Procedure 32.2.  The Court should also order restitution to the victims, as set forth in paragraphs 121 and 122 of the presentence report.

In determining the financial penalties and payment schedules, the Court should keep in mind that much of the present assets Shusterman reports were illicitly obtained and represent the proceeds of theft.

As his substantial assets, Shusterman lists $30,000 in securities of Public Media Works, a 2002 Saab valued at $11,000, and a note worth $90,000.

Public Media Works is a California entity related to Shusterman's film ventures, which Shusterman financed with stolen funds.  The 2002 Saab was purchased on March 23, 2002, for $42,161.48, which Shusterman took from Kimber. The promissory note represents funds owed to Shusterman by accountants in California, to dissolve a partnership they

briefly formed.  After sentencing, the government will seek

to forfeit this note as a substitute asset, pursuant to the

forfeiture judgment in this case.

    We also observe in the presentence report that

Shusterman received $28,000 in June 2006 from the sale of

rights to the film "Heart of Stone."  PSR ¶ 172.  His

disposition of these funds is not apparent in the PSR, as

Shusterman represented to the Probation Office that he only

has $1,300 in cash.  PSR ¶ 169.  Further, the Court should

be aware that Shusterman's ownership of movie rights to

"Heart of Stone" is entirely the result of illegal conduct.

    As reported in evidence submitted at trial, the

production of "Heart of Stone" was accomplished using a bank

account in the name of "D&S Screen Fund III" at Bank of

America.  In that account, Shusterman deposited $80,000

which came from investors; $110,000 which Shusterman

fraudulently transferred directly from Kimber; and $335,000

which came from M&D Consulting, Inc., Shusterman's company,

and which itself was stolen from Kimber.  Arguably, under

the terms of the limited partnership agreement pertinent to

the film, Shusterman was entitled to the film's first

receipts, to reimburse him for his expenditures to make the

movie.  But those expenditures were made entirely with money

stolen from Kimber.  Thus, Shusterman's recent $28,000

windfall represents nothing other than proceeds of fraud.

This should be considered as well in imposing sentence.


V.   <u>Conclusion</u>.

        For all of these reasons, the government

respectfully recommends that Shusterman be sentenced within

the range of 135-168 months, and be subjected to the other

penalties required by law.

                        Respectfully submitted,

                        PATRICK L. MEEHAN
                        United States Attorney


                        _____
                        ROBERT A. ZAUZMER
                        Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that I have caused to be served a true and correct copy of the attached Government's Trial Memorandum by electronic filing and by first-class mail, postage prepaid, upon:

Ari R. Karpf, Esq.
Karpf, Karpf & Virant
3070 Bristol Pike
Building 1, Suite 302
Bensalem, PA  19020

_____
ROBERT A. ZAUZMER
Assistant United States Attorney

Date:  August 2, 2006.